#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **MARY CASON, Special Administrator of the Estate of CHARLES KEITH CASON, deceased,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| vs. | ) ) | **CASE NO. 08-cv-617-PMF** |
| **HOLMES TRANSPORT, INC.,** | ) ) ) | |
| **Defendant.** | ) | |

### MEMORANDUM AND ORDER

**FRAZIER, Magistrate Judge:**

A bench trial was called and completed in this matter on November 23, 2009. Findings of Fact and Conclusions of Law follow.

### FINDINGS OF FACT

This lawsuit is the result of a tragic incident which took the life of Charles Keith Cason (his family called him Keith) on July 15, 2008. Mr. Cason, an Illinois resident, was driving alone on eastbound Highway 40 just west of Interstate 270 in St. Louis County, Missouri. He was stopped or slowed by traffic when a tractor-trailer owned and operated by defendant Holmes Transport, Inc., an Alabama corporation with its principal place of business in the state of Alabama, drove into Mr. Cason's car causing his death.

Defendant has stipulated that its driver, while acting within the scope of his employment, negligently caused the incident which caused Mr. Cason's death.

Mr. Cason was born April 20, 1953. He was 55 years old at his death. According to a report of the Social Security Administration, a male who has reached the age of 55 has a life expectancy

of an additional 24.37 years.  Mr. Cason was in good health at the time of his death.  He was gainfully employed as a salesman for Konica-Minolta.  Apparently, Mr. Cason was a very accomplished salesman.  In fact, he had just completed a large sale immediately prior to his death.  It is safe to conclude that his earning potential was $100,000 per year and that he would have continued to earn at least that much through his 65th birthday.  Mr. Cason was described as a very active and energetic man who may well have worked beyond 65, but in the absence of any evidence one way or another, 65 will work.

Mr. Cason's estate had the following final expenses:

Funeral expenses – $10,204.68

Internment – $1615.00.

Mr. Cason is survived by his wife, Mary Cason, and two sons, Ryan and Craig.  Both sons have reached adulthood.  Mary has not remarried.   All three testified at trial.  Their testimonies, assisted by photographs received in evidence, depict an extraordinarily close and loving family which was and is devastated by the circumstances which caused this trial.

Keith and Mary met in high school and began dating when in college.   They wed in November of 1974.  Keith's life revolved around his family and home.  The family camped and traveled together up to his death.  They were together for religious services every week and for family dinners. Such activities may sound a little ordinary, but watching each of them testify, it was apparent that the regularity of being together was treasured and is now sorely missed.  Keith and Mary had an affectionate, attentive relationship.  She described their sexual relations as being very good. Keith regularly performed small labors of love such as bringing coffee to her bedside each morning. It is obvious that Mary loved her husband very much and that she misses him greatly.

She is and will be for the rest of her life heart-broken.

Keith was viewed by each of his sons as a mentor, role model and best friend. Even after they reached adulthood, Keith had near daily contact with Ryan and Craig.

Both young men spoke of the closeness the family enjoyed . . .a "hugging family." As noted above, they had regular gatherings for church and dinner. The entire family continued to enjoy vacations together after the sons were grown. Each of them continued to look to his father for advice and love. Keith Cason was a fine father who raised two fine sons who will always cherish his memory. They also are heart-broken.

## **CONCLUSIONS OF LAW**

This Court has jurisdiction of this matter pursuant to 18 USC §1332. Venue is proper in this district.

Mary Cason is the duly appointed special administrator of the estate of Charles Keith Cason. This action is brought under the Illinois Wrongful Death Act 740 ILCS 180/1 et. seq. for the benefit of Mary Cason, Ryan Cason and Craig Cason.

With negligence and causation stipulated to by defendant, all that remains is calculation of damages. Those damages will concentrate on the money, benefits, goods and services Keith contributed in the past and was likely to contribute in the future; his age, sex, health and habits; the relationships which existed between Keith and his wife and Keith and each of his sons; the grief, sorrow and suffering of Mary, Ryan and Craig; the loss of sexual relations, companionship and society suffered by Mary; the loss of companionship and society suffered by each Ryan and Craig.

Keith's income was pegged at $100,000 per year until his 65th birthday, or $1,000,000. I understand that there is no reduction for present cash value, but no such testimony was offered from

either side. Taking judicial notice of current economic circumstances, it is reasonable to infer that the applicable inflation and discount rates would offset, producing a very similar result.

The other numbers are not so easily calculated. Those involve the non-economic aspects of Keith's life, namely, the relationships he enjoyed with his wife and sons.

The United States Circuit Court for the Seventh Judicial Circuit suggested in *Arpin v. United States*, 521 F.3d 769 (7th Cir. 2008), that the Court should look to the fields of math and economics to determine the value of personal relationships between loved ones. According to the Seventh Circuit, it is possible to determine the dollar value of a human life and its various relationships by examining the risks a person is willing to undertake in order to gain certain rewards. Under such an approach, once it is known what surcharge a person would exact to increase the risk to his life and/or limbs, then it would be possible to calculate the value of his life . . . or maybe his legs or other body parts. I suppose this hinges on having precisely determined and reliable factors such as the likelihood that the risk being undertaken actually will occur. Problem is, by the time such circumstances work their way into courts, the dreaded occurrence has already happened. Perhaps then, the better approach would be to calculate at what price people would agree to walk themselves or a loved one into a catastrophic situation knowing the payoff. My guess is that very few would be takers on that.

The Seventh Circuit went on to suggest that a ratio approach be employed to determine such damages as loss of society, legalese for the value of lost love and loved ones. Similar cases are to be studied with an eye toward striking a ratio between loss of society found in those cases to the economic loss determined in the same case. If, for example, a person earning $1,000,000 per year is killed by a negligent motorist and the economic loss suffered by his estate is determined to be

$20,000,000, and a 1 to 4 ratio is found to exist in other similar cases, then his love and affection now missed by his family is worth $5,000,000.  If he is accompanied by a lower paid employee who perishes in the same accident and makes only $40,000, with a total economic loss of $600,000 then his family's grief is worth only $150,000.  Granted, other factors such as actual closeness of relationships, ages of children, etc. are taken into some consideration, but it is doubtful that the resulting disparity in loss of society between the two will approach reality no matter how much . . . or how little . . . either of them were actually loved and missed by their respective families.

The inevitable result of such a plug and chug approach will be a body of law which establishes a Blue Book value on grief and emotional trauma and which will certainly stand for the proposition that higher income people have more valuable relationships with loved ones than lower earners.  Those who run up enormous medical bills prior to dying will leave loved ones whose grief is worth much more than those who perish instantly.  The extreme will involve the unemployed person who dies without medical bills and a has a modest funeral.  Without economic loss, any ratio will produce meager loss of society no matter what relationships are left behind.  Anything times zero always equals zero.  Finally, consider the inequity which arises when a person dies at that hands of a negligent government physician as opposed to one who dies from exactly the same brand of negligence rendered by a private physician.  In the former case, the Federal Tort Claims Act insures a bench trial and the ratio treatment.  In the latter, a jury trial is available and Illinois law prohibits juries from considering other results in similar cases.  *See Richardson v. Chapman*, 676 N.E.2d 621, 628-29 (Ill. 1997).

Granted, the ratio approach was simply suggested and not mandated.  Chief Judge Herndon so found in his recent Memorandum and Opinion in *Arpin v. United States*, 2009 WL 3816844 (S.D.

Ill)(Arpin II). After an exhaustive search, the only case he determined to be similar to the one before him was *Barry v. Owens-Corning Fiberglass Corp*, 668 N.E.2d 8 (Ill App. 1996). He went on to award the surviving spouse $4,000,000 and each of his four surviving children $750,000.

I now find two cases to be very similar to the Casons': *Barry* and *Arpin II*. It is hard to fully comprehend how quickly and completely lives are changed through the negligence and stupidity of another. It is likewise difficult to imagine how money in any amount could ease their suffering, but the law in this state is that loss of society is compensated by money damages in an amount presumed to be substantial. This was a wonderfully close and loving family which had as its axis Keith Cason. It is doubtful, make that impossible and absurd, to believe that Mary, Ryan and Craig Cason would have expressed any more love or sorrow for and about their husband and father had he been earning one million dollars per year as opposed to that which he did. Likewise, I believe that they would be just as devastated by the circumstances had his earnings been half or a third of what they were. At no point in their very touching testimonies did they speak of how much they loved his income and the economic value he brought to the family unit. The economic loss occasioned by the criminal negligence of defendant's driver simply had nothing to do with their loss of society and consortium. That disconnect makes the ratio approach inappropriate for this case.

Damages are as follows:

1. Lost earnings – $1,000,000.00

2. Final expenses – $11,819.68

3. Loss of society and consortium:
   Mary Cason – $4,000,000.00;
   Ryan Cason – $750,000.00;
   Craig Cason – $750,000.00.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED: December 8, 2009.**

               *s/ Philip M. Frazier*
               **HON. PHILIP M. FRAZIER**
               **UNITED STATES MAGISTRATE JUDGE**